## CHERRY v. SWAB and others.

(Circuit Court, S. D. Iowa.    June Term, 1884.)

PATENT—IMPROVEMENT IN CANS FOR TRANSPORTATION OF CREAM.
    The patent of Cherry for improvement in cans for the transportation of cream had been anticipated, and hence there was no infringement by Swab.

This is a bill in equity to restrain the respondents from the infringement of the complainant's patent for an improvement in cans for the transportation of cream and milk, and for an account of profits and damages.

*Munday, Evarts & Adcock* and *Stoneman, Ricket & Eastman,* for complainant.

*Goode, Wishart & Phillips,* for respondents.

LOVE, J. It is manifest that in the transportation of cream and milk in cans from the farm to the factory, for the purpose of being made into butter, it is important to prevent the liquid from dashing about the vessel and becoming more or less churned in the course of

transit. Long before the complainant's patent, various contrivances had been adopted to accomplish that purpose. Among these was the plain float fitting loosely inside the can and resting on the surface of the milk or cream. The pressure of the float prevented, to a certain extent, the agitation of the liquid below. This float had, usually, a central ventilating hole or tube. It was generally in use prior to the plaintiff's invention, and it is the can provided with this float upon which the complainant's can is claimed to be an improvement. The plain float was quite effective, so far as the preventing of the churning was concerned, but it was inconvenient and objectionable from the fact that it had to be removed from the can whenever any quantity of cream, however small, had to be poured into the can. This not only caused delay, but it exposed the cream to contamination from dust, dirt, etc. Besides, in very cold weather it is obvious that the cream, adhering to the sides of the float, would become frozen, so as to prevent the float from performing its office within the can.

The plaintiff's alleged invention consists of a can combined with a funnel-shaped float resting on the surface of the liquid, and so fitted to the can as to rise and fall in the vessel with the liquid. The upper surface of the float is concave, resembling closely the shape of an ordinary tin spittoon. There is a hole in the center of the float through which the cream or milk is poured into the can. Thus the complainant claims that the combination unites four elements: (1) The can body; (2) the float; (3) the concave top or funnel; (4) the opening leading from the funnel through the float. The complainant makes no claim to the invention of any of these parts or elements. They were all known prior to the plaintiff's alleged invention. But the complainant claims that he was the first to bring them into combination to produce the result attained. The complainant insists that by means of his combination can the gathering and transportation of milk and cream can be accomplished with greater dispatch, less inconvenience, and better results than by means of any can used for that purpose prior to his invention.

But the real difficulty in the solution of this controversy grows out of the question of novelty. The respondents give evidence showing that many years before the complainant's invention a can was known and used in the state of New York substantially the same in its elements and purposes as the complainant's can. It appears by the evidence that this New York can was in extensive use, and that it combined all the essential parts or elements of the complainant's alleged invention. The models exhibited, together with the evidence, show that the four elements which the complainant's able and learned counsel claim as essential to their combination are all found in the prior New York can: (1) The can body; (2) the float; (3) the concave top or funnel; (4) the opening leading from the funnel through the float.

Judging by a comparison of the models before the court, and by

the evidence adduced, it is difficult to find any essential difference between the principle of the New York can and of the complainant's invention. The immediate purpose of both was to prevent the agitation and churning of the liquid, as far as possible, and to insure its return to the can over the concave surface and through the opening in the center, when the milk or cream happened to be forced by the jostling of the can through the opening of the float. This was accomplished in both cans by means of the float, the concave top, and the opening in the center,—through which the liquid could be poured without removing the float,—all combined with the ordinary milk can in use in the gathering and transport of cream and milk. If the combination and function of the two cans is the same, it is not material to the argument, as counsel seem to assume, that many individuals, in using the New York can, invariably removed the float in filling the can. The question is not, how it was actually used, but rather how it was capable of being used. Farmers, in filling a can for transportation, would very naturally remove the float and replace it when the can was filled. This would be more convenient for them, and the chief function of the float being to prevent splashing and churning in the transit, they would see no object in pouring the milk or cream through the opening in the concave float before delivering it for transportation to the cream-gatherer. But the cream-gatherer himself, in going from house to house collecting the cream or milk in small quantities, would find it highly inconvenient to remove the float and replace it whenever he should receive a pint or quart of the liquid. With him, moreover, the necessity of using the float would commence with the gathering of the cream, and continue to the end of the transit, in order to prevent its agitation and churning.

The complainant's counsel contend that the two cans were not identical; that the float is an essential element of the complainant's combination, and that there was no float in the New York can; that the contrivance in the New York can was not a float, but a close-fitting piston cover, which had to be moved up and down within the can by the application of external force. I do not understand the learned counsel to contend that with respect to all of the other elements the New York can was essentially different from the complainant's combination.

It is insisted that only two witnesses called by the defendants testify to the existence and use of the New York can, and that these witnesses, "by design or accident, in giving their testimony, call these covers "floats," one of them using the two terms—i. e., covers and floats — indiscriminately; and that these witnesses fail to state, either by design or accident, how the cans actually worked, and whether the covers fit tight or loose in the cans." But it so happens that not only the defendants' two witnesses, but several witnesses called by the complainant, testify to the use of the New York cans, and they repeatedly call these contrivances "floats." Why did the

complainant's witnesses call them "floats" if they were not "floats?" If the contrivance was a piston cover, fitted tightly to the can, why did the complainant's witnesses repeatedly misname them "floats?" Was this misleading misnomer the result of "design" on their part? Or, if it was merely an accidental misuse of the words, why did not counsel, in the examination, cause them to explain their meaning more clearly?

Again, it is said that the New York cans "all had tight-fitting piston covers and not floats, whether made flat, convex, or concave," and that "it is perfectly clear from the testimony, and *beyond all dispute*, that these New York cans were nothing but piston-cover cans." This is certainly a grave misapprehension of the testimony: *First*, because the witnesses for both plaintiff and defendant repeatedly call them "floats," and we must assume that they knew the meaning of words. But several witnesses are more explicit. Hawley says, speaking of the New York cans, "The cans we used for transporting milk had what we called covers that *floated on the top of the milk*." The same witness, called in rebutting by the complainant, says, in his testimony in chief, "The float was smaller than the can, and would move up and down in the inside of the can." William Tallman, called by the complainant, says, in chief: "The float to the first can that I used was made so that the float would readily slip in the can. The float had a concave top with a hole in the center and a tube longer than the depth of the float, extending, I think, an inch and a half below the bottom of the flange." Again, same witness: "One of the floats I used fit tight to the can and the other did not. The one I sent to Des Moines did not, and would settle down to the milk. I also had another can that I used. It would readily drop to the bottom of the can of its own weight. It would not remain in the position in which it was placed." Asher J. Barrett, complainant's witness, testifies touching floats used in New York, "Have had floats that fit tight and have had them that would not." John E. Lourey, complainant's witness, "*Some* of the floats fit tight enough in the cans to stay where you put them." It may be implied that there were other floats known to this witness that did not fit tight to the can and stay where they were put. George L. Cane, complainant's witness, says: "Have used floats on hauling cans, like model No. 7, as long as twelve or fifteen years ago. Never saw a can used with any cover, except what you call a float, except milk cans for shipping milk to the city, and don't know that they had anything but a cover." Other witnesses examined by the complainant testify to having seen made or used cans with covers concave on the top, and with opening in the center closely fitted to the walls of the can. These covers could be moved up and down in the can, and would stay where they were placed. Now, this evidence, taken all together and fairly considered, clearly proves that cans with contrivances of both kinds were used in New York,—some with concave floats resting on the surface of the fluid; others with

what counsel call piston covers, concave at the top and closely fitted to the can. The latter might be moved up and down with the hand. When the liquid was poured into the can the cover could be elevated without being removed from the can; when this was accomplished the cover could be pushed down to the surface of the fluid, thus preventing the churning of the milk or cream. Some purchasers might prefer one contrivance and some the other, and so both would get into use, as they did, according to the testimony of some of the witnesses.

This view sufficiently answers the argument of counsel that "some of the witnesses state they had difficulty in getting the covers in and out, they fit so tight, and that the handles would frequently pull off." Counsel would infer, from this fact, that there were, in fact, no floats, in a proper sense of that word, but only "tight-fitting piston covers." This argument is untenable for several reasons: *First*, because the difficulty experienced by these witnesses was probably with the tight-fitting covers which, as we have seen, were in use as well as the floating covers; *second*, because nothing is more probable than that the cans frequently, in handling, became bruised or battered, so that it would be difficult to remove the float, which would be made to fit the can as closely as possible, consistent with its office of moving in the can on the surface of the fluid; *third*, because if the can and the float did not exactly correspond in form, one being, perhaps, perfectly circular, and the other not,—which might often happen from imperfect workmanship,—there would be difficulty in getting the float or cover in and out of the can. Counsel in this argument particularly advert, as quite conclusive, to the testimony of a witness for defendants, who, as quoted by the counsel, says "he remembers what a time he used to have in getting the covers out." This is in the testimony of Tallman. What he does say is as follows: "It was a part of my work, when I was a boy, to wash these floats. I remember what a time I would have getting the floats out of the can, and getting them in again, *as they would sometimes get burst out of shape*." The omitted words, "they would sometimes get burst out of shape," change the entire effect of the witness' testimony.

The complainant's invention having been anticipated, his patent cannot be sustained, and his bill must be dismissed, with costs.